COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-01-227-CV*
 
 
WESTCHESTER FIRE INSURANCE 
COMPANY                                               APPELLANT
 
V.
 
ADMIRAL INSURANCE COMPANY                                                                 APPELLEE
 
 
------------
 
FROM THE 48TH DISTRICT COURT 
OF TARRANT COUNTY
 
------------
 
OPINION ON REHEARING EN 
BANC
 
------------
Introduction
        After 
en banc reconsideration and oral argument granted on appellee Admiral Insurance 
Company's (Admiral) motion for rehearing, we withdraw our prior opinion and 
judgment dated June 26, 2003 and substitute the following.  See Tex. R. App. P. 49.1, 49.3, 49.7.
        This 
case involves a Stowers action by an excess insurance carrier—the 
insured’s equitable subrogee—against the insured’s primary carrier for the 
negligent failure to settle an insurance claim within policy limits.  See 
G.A. Stowers Furniture Co. v. Am. Indem. Co., 15 S.W.2d 544, 547 (Tex. 
Comm’n App. 1929, holding approved).  Appellant Westchester Fire 
Insurance Company (Westchester), the excess insurance carrier, challenges the 
trial court’s directed verdict for Admiral, the primary carrier, and the 
partial summary judgment upon which it was based.  We reverse the partial 
summary judgment in part, and reverse the directed verdict, and remand the case 
for trial.
Background
        In 
1994 PeopleCare Heritage Western Hills, Inc. (PeopleCare), the owner of Heritage 
Western Hills Nursing Home, had a primary policy of professional medical 
liability insurance with Admiral with limits of $1,000,000 per occurrence and an 
excess policy with Westchester with limits of $10,000,000 per occurrence. Beulah 
Cagle was a patient at Heritage Western Hills. In December 1994, Beulah and her 
daughter Lola Cagle sued PeopleCare for negligence, gross negligence, fraud, and 
violations of the Texas Deceptive Trade Practices Act (DTPA) arising out of 
PeopleCare’s treatment of Beulah from January through May 1994. See Tex. Bus. & Com. Code Ann. §§ 
17.01-.854 (Vernon 2002 & Supp. 2004-05).
        After 
a bench trial, the trial court found that PeopleCare was negligent and grossly 
negligent in its treatment of Beulah and that it knowingly misrepresented the 
nature of Beulah’s injuries to Lola. In findings of fact and conclusions of 
law, the trial court found that Beulah was entitled to compensatory damages, 
plus prejudgment interest, and that Lola was entitled to mental anguish damages, 
treble damages, attorneys’ fees, and prejudgment interest under the DTPA. The 
compensatory damages awarded to the Cagles exceeded Admiral’s policy limits. 
The trial court then scheduled a hearing on exemplary damages.[1]  
Before the hearing, PeopleCare settled the Cagles’ suit for an amount 
exceeding the Cagles’ compensatory damages, with Admiral tendering its policy 
limits, less defense costs and PeopleCare’s deductible, and Westchester 
contributing the remainder.
        Westchester 
then filed suit against (a) Admiral, alleging, among other things,[2] that Admiral negligently failed to settle the Cagles’ 
claims against PeopleCare within the limits of the primary insurance policy, and 
(b) Gardere & Wynne, L.L.P., the law firm that represented PeopleCare in the 
Cagle suit, for negligence in defending the suit. Before trial, the trial court 
granted Admiral a rule 166a partial summary judgment, holding that

insurance coverage for punitive damages, now and at the time in question, 
violates the public policy of the State of Texas.  Accordingly, coverage 
for punitive damages under the Admiral insurance policy is void. . . . [T]his 
court [also] finds that the award of damages and attorneys’ fees for knowing 
misrepresentation under the DTPA were not covered by the Admiral insurance 
policy.
 
Since Westchester Fire’s Stowers 
recovery, if any, only extends to claims that were within the scope of the 
Admiral policy’s coverage, its recovery is limited to [Beulah] and Lola 
Cagle’s actual damages.
 
Tex. R. Civ. P. 166a. Thus, the court 
held that Westchester’s recovery of damages from Admiral, if any, would be 
limited to the amount of the Cagles’ compensatory damages that exceeded 
Admiral’s settlement contribution.[3]
        Before 
Admiral completed its case-in-chief, Westchester settled with Gardere & 
Wynne for an amount greater than the amount by which the Cagles’ compensatory 
damages exceeded Admiral’s settlement contribution.  Accordingly, on 
Admiral’s motion, the trial court granted Admiral a directed verdict on the 
ground that Admiral was entitled to a credit in the amount of Gardere & 
Wynne’s settlement with Westchester, and the amount of the credit exceeded the 
damages Westchester could recover from Admiral.  See Tex. Civ. Prac. & Rem. Code Ann. §§ 
33.012, 33.014 (Vernon 1997).
Issue Presented
        In 
a single point on appeal, Westchester challenges the directed verdict on the 
ground that the trial court erred in granting the partial summary judgment for 
Admiral that limited the amount of damages Westchester could recover from 
Admiral to compensatory damages because Westchester contends punitive damages 
were covered under Admiral’s policy at the time the Cagle case was settled.[4] Westchester does not challenge the directed verdict 
independently of the partial summary judgment; therefore, in reviewing 
Westchester’s arguments on appeal, we will address only whether the trial 
court erred in granting partial summary judgment on Westchester’s Stowers 
claim. Likewise, Westchester does not challenge the directed verdict to the 
extent that it denied Westchester recovery from Admiral for amounts attributable 
to treble damages and attorneys’ fees awarded to Lola Cagle for PeopleCare’s 
deceptive trade practices violations on the basis that those damages were not 
within coverage of the Admiral policy. Consequently, we do not address whether 
the partial summary judgment was proper as to those damages.
        Westchester 
contends that the trial court erroneously relied on a federal case construing 
Texas law in determining that insurance coverage for punitive damages at the 
time the Cagle cause of action arose or was settled was void as against public 
policy. In addition, Westchester claims the trial court erred in not relying on 
several Texas court of appeals cases holding that punitive damages were 
insurable in Texas at the time the Cagle cause of action arose or when the case 
settled. Westchester further claims that the trial court erroneously relied upon 
the “volunteer doctrine” in granting the partial summary judgment, averring 
that this case turns upon whether in 1995 Westchester had a good faith, 
reasonable belief that punitive damages were insurable in Texas at the time the 
Cagles’ cause of action arose or when the case settled.
Standard of Review
        Questions 
of law are appropriate matters for summary judgment. Rhone-Poulenc, Inc. v. 
Steel, 997 S.W.2d 217, 222 (Tex. 1999). A defendant is entitled to summary 
judgment if the summary judgment evidence establishes, as a matter of law, that 
at least one element of a plaintiff’s cause of action cannot be established. Elliott-Williams 
Co. v. Diaz, 9 S.W.3d 801, 803 (Tex. 1999). When reviewing a summary 
judgment granted on specific grounds, this court can affirm the summary judgment 
only if the ground on which the trial court granted relief is meritorious. Cincinnati 
Life Ins. Co. v. Cates, 927 S.W.2d 623, 625-26 (Tex. 1996). However, if a 
party preserves other grounds presented in the summary judgment motion that were 
not ruled on by the trial court, a court of appeals must also consider any other 
grounds that the trial court did not rule on. Id. at 626. To preserve 
these grounds, the party must raise them in the summary judgment proceeding and 
present them in an issue or cross-point on appeal. Id. at 625-26.
Volunteer Doctrine
        The 
motion for partial summary judgment that was granted in Admiral’s favor did 
not raise Westchester’s voluntariness as a challenge to Westchester’s right 
to be equitably subrogated to PeopleCare. And nowhere in the partial summary 
judgment does the trial court state that Westchester’s payment of the 
settlement funds was voluntary. In addition, before filing the motion for 
partial summary judgment upon which the trial court’s directed verdict was 
based, Admiral filed a separate motion for partial summary judgment that 
specifically challenged Westchester’s right to equitable subrogation based on 
the volunteer doctrine. The record does not contain any order granting or 
denying this motion, but an entry on the trial court’s docket sheet indicates 
the following: “Admiral’s MSJ - denied because fact question on volunteer 
payment (reasonable belief rule).” Moreover, the trial judge stated that the 
basis for the directed verdict was his prior ruling that Admiral’s policy did 
not provide coverage for either punitive damages or Lola’s DTPA damages; he 
did not say the directed verdict was based on the volunteer doctrine. Thus, it 
appears that the trial court denied summary judgment on that ground, and Admiral 
concedes this in its brief.
We address the voluntariness 
issue only because it was raised and ruled on at trial and because Westchester 
has discussed it on appeal and at oral argument on rehearing en banc.
        Westchester 
contends that the trial court’s partial summary judgment is incorrect because 
it was erroneously based on the volunteer doctrine. Relying on Keck, Mahin 
& Cate v. National Union Fire Insurance Co., PA, 20 S.W.3d 692 (Tex. 
2000), Westchester contends that in 1995 it had a reasonable, good faith belief 
that insurance coverage for punitive damages did not violate public policy and 
that it had no choice but to settle the portion of the Cagle claim attributable 
to punitive damages, regardless of whether punitive damages were actually 
covered under its policy and Admiral’s policy at that time. Thus Westchester 
argues that it should not be precluded from recovering from Admiral damages 
attributable to amounts Westchester paid to settle the portion of the Cagle 
claim related to punitive damages. Admiral responds that Westchester’s Keck 
argument was not the basis for the partial summary judgment it obtained and is 
not dispositive of this appeal.
        The 
volunteer argument in the Keck case was asserted as a bar to equitable 
subrogation. Id. at 702. A Dictionary of Modern Legal Usage defines 
“subrogate” as “to put (a person) in the place of, or substitute (him) 
for, another in respect of a right or claim.” A Dictionary of Modern Legal Usage 525 
(1987). The two key elements of equitable subrogation are 1) that the party on 
whose behalf the claimant discharged a debt was primarily liable on the debt and 
2) that the claimant paid the debt involuntarily. Argonaut Ins. Co. v. 
Allstate Ins. Co., 869 S.W.2d 537, 542 (Tex. App.—Corpus Christi 1993, 
writ denied). Thus, one who has involuntarily discharged a debt on behalf of 
another who is primarily liable for that debt is entitled to pursue any right or 
claim the debtor would have against a third party in relation to the debt.  
But to enforce such a right or claim, the subrogee must first prove the 
debtor’s (and thus, the subrogee’s) entitlement to recover on the right or 
claim.  See Am. Centennial Ins. Co. v. Canal Ins. Co., 843 
S.W.2d 480, 483-85 (Tex. 1992); 68 Tex. 
Jur. 3d Subrogation § 35 (1989) (“One who is entitled to subrogation 
stands in the shoes of the creditor whose rights he or she claims, and can 
enforce every right that was available to the creditor. . . . [b]ut he or she 
can enforce only such rights as the creditor could enforce.”).  
Therefore, the issue of voluntariness is relevant only to a party’s standing 
to bring a cause of action as a subrogee.  Drilltec Tech., Inc. v. Remp, 
64 S.W.3d 212, 216 (Tex. App.—Houston [14th Dist.] 2001, no pet.).  Once 
this issue is decided in favor of the party’s ability to bring suit, it has no 
relevance to the proof required for the party to actually recover on its cause 
of action.
        In 
Keck, the supreme court held that an excess insurer’s settlement of a 
case was not voluntary—even though the excess carrier’s own policy did not 
provide coverage—because at the time of the settlement, the excess carrier 
made the payment in good faith and reasonably believed the payment was necessary 
for its protection.  Keck, 20 S.W.3d at 702–03. In light of this 
“reasonable belief” rule and the supreme court’s liberal interpretation of 
it, the court held that
 
[i]f an insurance company’s [excess insurer’s] right to subrogation could be 
challenged by the wrongdoer [e.g., attorneys, primary insurer, etc.] on the 
grounds that the [excess] policy did not actually provide coverage, it would 
necessarily be in the company’s interest to litigate all questionable claims 
with its insured.  The effect of ignoring the reasonable belief rule, 
therefore, is to discourage insurance companies from paying or settling disputed 
claims and thereby force insureds more often into litigation with their 
insurers.
 
Id. at 703 (quoting 1 Allan D. Windt, Insurance Claims & Disputes 
§ 10.10, at 150-51 (3rd ed. 1995)).  Thus, in Keck, because 
the excess carrier’s settlement payment was involuntary, the excess carrier 
was equitably subrogated to any claims its insured could assert against a 
wrongdoer; that is, it could bring the malpractice action against its 
insured’s trial counsel.  See id.  Likewise, in this case, 
Westchester, the excess insurer, was subrogated to any rights PeopleCare could 
assert against its primary carrier, Admiral, so long as its payment on the 
underlying claim was involuntary.  Further, under Texas law, an excess 
insurer’s payment to settle a suit against the insured is presumptively 
involuntary for subrogation purposes.  Id. at 702.
        Under 
the Keck analysis, if Westchester in good faith reasonably believed at 
the time of settlement that its payment was necessary for its protection, then 
its settlement was not voluntary, and it was entitled to equitable subrogation, 
i.e., entitled to maintain a cause of action against Admiral in the place of 
Admiral’s insured, PeopleCare.  See id. at 702-03; Argonaut, 
869 S.W.2d at 542.  Whether Westchester reasonably believed its payment was 
necessary, and, therefore, whether its payment was involuntary, is a question 
that relates to its right of subrogation.  Even if Westchester was 
entitled to bring a Stowers cause of action against Admiral as 
PeopleCare’s equitable subrogee, it still had to prove the elements of 
the cause of action, just as the insurer in Keck still had to prove the 
insured’s malpractice action against the insured’s trial counsel.
        Westchester, 
in PeopleCare’s place, pursued its Stowers action against Admiral.  
See Am. Centennial, 843 S.W.2d at 483.  As PeopleCare’s equitable 
subrogee, Westchester’s ability to recover damages on PeopleCare’s Stowers 
claim was limited to PeopleCare’s ability to recover damages as Admiral’s 
insured.  See id. at 483; Nat’l Union Fire Ins. Co. v. Ins. Co. 
of N. Am., 955 S.W.2d 120, 134 (Tex. App.—Houston [14th Dist.] 1997), aff’d 
sub nom., Keck, 20 S.W.3d at 704.  The Stowers duty to settle is 
not activated unless three prerequisites are met: (1) the claim against the 
insured is within the scope of coverage, (2) the claimant has made a settlement 
demand that is within the policy limits, and (3) the terms of the demand are 
such that an ordinarily prudent insurer would accept it, considering the 
likelihood and degree of the insured's potential exposure to an excess judgment.  
Am. Physicians Ins. Exch. v. Garcia, 876 S.W.2d 842, 849 (Tex. 1994).  
“[A]n insurer has no duty to settle a claim that is not covered under its 
policy.”  Id. at 848.
        Thus, 
determining that Westchester’s payment of settlement funds on behalf of 
PeopleCare was involuntary—entitling it to be subrogated to PeopleCare’s Stowers 
cause of action against Admiral—only resolves Westchester’s right to 
pursue a Stowers claim; it would still have to prove its Stowers 
cause of action against Admiral. Whether or not the insured (or its 
equitable subrogee) has a reasonable, good faith belief that a policy provides 
coverage for a claim is not key to a Stowers cause of action.  The 
issue is whether the duty to settle was breached. Even if Westchester is correct 
in contending that its payment of settlement funds was involuntary, the 
“involuntariness” of its payment does not resolve the issue of whether 
Admiral breached its duty to PeopleCare to settle all covered claims asserted 
against PeopleCare.  Thus, we agree with Admiral that the volunteer issue 
is not dispositive of this appeal.
Insurance Coverage for Punitive Damages
        Admiral’s 
Motion for Partial Summary Judgment contends that, as a matter of law, any 
portion of Westchester’s Stowers claim attributable to punitive damages 
must fail because (1) such damages are excluded from coverage by Admiral’s 
policy language and (2) contracting for insurance coverage for punitive damages 
violates Texas’s public policy.  Thus, Admiral argues Westchester cannot 
satisfy the first element of a Stowers claim: that the damages it seeks 
against Admiral are within the scope of coverage of Admiral’s policy.  
And if punitive damages are not covered under Admiral’s primary policy, 
Westchester may not recover any excess judgment attributable to such punitive 
damages in its Stowers action.  The trial court’s partial summary 
judgment in favor of Admiral on punitive damages was based upon its 
determination that insurance coverage for punitive damages is against public 
policy.  The court did not agree with Admiral that the policy language 
itself excluded coverage.[5]
        Policy Language
        On 
appeal Admiral again argues that punitive damages are not covered by its policy 
because they are based on conduct that results in expected or intended injuries, 
and the policy provides coverage only for injuries that are “neither expected 
nor intended by the insured.”  Admiral claims that grossly negligent 
behavior can never be an accidental error or omission.  However, as 
mentioned above, the trial court expressly rejected this ground for partial 
summary judgment.
        The 
commercial general liability (CGL) portion of Admiral’s policy covered 
“those sums which the Insured shall become legally obligated to pay as damages 
because of . . . bodily injury . . . caused by an occurrence.”  The 
policy defined “occurrence” as “an accident . . . which results in bodily 
injury . . . neither expected nor intended from the standpoint of the 
Insured.”  However, the policy also contained a portion entitled 
“Coverage O-Hospital Professional Liability,” which stated that
 
Admiral will pay on behalf of the insured those sums which the insured shall 
become legally obligated to pay as damages because of bodily injury to any 
person arising out of the rendering of or failure to render, during the policy 
period, the following professional services:
 
. . . Nursing treatment to 
such person including the furnishing of food or beverages in connection 
therewith.
 
Thus, while the CGL portion of 
the policy limits coverage to bodily injury arising out of an occurrence, the 
Hospital Professional Liability portion does not. It provides coverage for 
nursing home care and does not limit recovery to only an “accident” or 
“occurrence.”
        The 
trial court in the underlying Cagle case found that PeopleCare’s failure to 
provide care for Beulah (e.g., leaving her in a urine-soaked bed) was grossly 
negligent.  Thus, any damages, including punitive damages, that the trial 
court could have awarded to Beulah based on such failure to render care would 
have been covered under the language of the Hospital Professional Liability 
portion of PeopleCare’s policy.  Consequently, the trial court properly 
denied partial summary judgment on the ground that Admiral’s policy language 
precluded coverage for punitive damages.
        Admiral 
contends that the Fifth Circuit case St. Paul Fire & Marine Insurance Co. 
requires a different result.  St. Paul Fire & Marine Ins., Co. v. 
Convalescent Servs., Inc., 193 F.3d 340, 343 (5th Cir. 1999) (holding under 
Texas law that insured could not recover from insurer portion of excess judgment 
attributable to punitive damages when policy specifically excluded coverage for 
punitive damages).  However, in the St. Paul case, unlike this case, 
the insurer, rather than settling with the plaintiff for amounts not covered by 
its policy, reserved its coverage dispute and filed suit for declaratory relief 
seeking a determination that it was not liable for payment of a punitive damages 
award against its insured.  Id. at 341.  Additionally the value 
of the covered claim in St. Paul was well below policy limits as opposed 
to the claim in this case.  Id. at 343.  More importantly, the 
primary policy in St. Paul specifically excluded coverage for punitive 
damages, and the federal court explicitly relied on this exclusion in making 
its Erie guess on Texas law.  Id. at 345 (citing Erie R.R. 
v. Tompkins, 304 U.S. 64, 58 S. Ct. 817 (1938)).  We therefore cannot 
agree that St. Paul is controlling over Admiral’s policy because of the 
differences in the policies’ language.
        Further, 
there is no evidence in the record that Admiral assumed the defense of the 
Cagles’ claims under a reservation of rights or that Admiral ever challenged 
coverage for any of the Cagles’ claims until after Westchester had settled the 
Cagles’ suit and brought this action.  Also, the evidence showed that 
Admiral was aware of its insured’s exposure to punitive damages and, 
therefore, its own.  In a letter from Admiral to Westchester, Admiral 
stated, “Regarding evaluation of punitive exposure, punitive damages are not 
excluded from our policy.  As the case is venued in Texas, we are aware of 
the danger of punitive damages and are making every effort to settle this 
matter.”  From this, we can only conclude that Admiral believed its 
policy on PeopleCare covered both the negligence and gross negligence claims as 
it considered and made settlement offers and that the trial court properly 
denied Admiral’s motion for partial summary judgment on this basis.
        Public Policy
        Generally, 
the legislature determines public policy.  FM Props. Operating Co. v. 
City of Austin, 22 S.W.3d 868, 873 (Tex. 2000) (holding legislative power is 
the power to make rules and determine public policy).  Courts look to state 
statutes and judicial decisions to determine public policy. Stubbs v. Ortega, 
977 S.W.2d 718, 722 (Tex. App.—Fort Worth 1998, pet. denied).  The 
supreme court has long held that “contracts against public policy are void and 
will not be carried into effect by courts of justice.”  James v. 
Fulcrod, 5 Tex. 512, 520 (1851).  A contract is against public policy 
if it is illegal or injurious to the public good. See 14 Tex. Jur. 3D Contracts § 143 
(1997).
        Our 
supreme court is highly deferential to the legislature when determining this 
state’s public policy, stating that
 
[p]ublic policy . . . is a term of vague and uncertain meaning, which it 
pertains to the law-making power to define, and courts are apt to encroach upon 
the domain of that branch of the government if they characterize a transaction 
as invalid because it is contrary to public policy, unless the transaction 
contravenes some positive statute or some well-established rule of law.
 
Tex. Commerce Bank, N.A. v. 
Grizzle, 96 S.W.3d 240, 250 (Tex. 2002) (quoting Lawrence v. CDB Servs., 
Inc., 44 S.W.3d 544, 553 (Tex. 2001)).
        A 
court should not decide a public policy question without first evaluating the 
contract language.  Tex. Farmers Ins. Co. v. Murphy, 996 S.W.2d 873, 
878 (Tex. 1999).  Only if a contractual provision violates public policy 
should a court not enforce it. Alma Invs., Inc. v. Bahia Mar Co-Owners Assn., 
999 S.W.2d 820, 823-24 (Tex. App.—Corpus Christi 1999, pet. denied).  The 
Texas Supreme Court has applied the public policy doctrine found in the 
Restatement of Contracts (Second).  Id. (citing Beck v. Beck, 
814 S.W.2d 745, 748-49 (Tex. 1991), cert. denied, 498 U.S. 1048 (1991); DeSantis 
v. Wackenhut Corp., 793 S.W.2d 670, 681-82 (Tex. 1990) (op. on reh’g)).  
Section 178 provides that “a promise or term of an agreement is unenforceable 
on grounds of public policy if legislation provides that it is unenforceable or 
the interest in its enforcement is clearly outweighed in the circumstances by a 
public policy against the enforcement of such terms.”  Id. at 824 
(quoting Restatement (Second) of 
Contracts § 178(1) (1981)).  Accordingly, when faced with a need to 
determine whether a contract term violates this state’s public policy, we 
should take into account the following factors:
 
(a) the strength of that policy as manifested by legislation or judicial 
decisions,
(b) the likelihood that a 
refusal to enforce the term will further that policy,
(c) the seriousness of any 
misconduct involved and the extent to which it was deliberate, and
(d) the directness of the 
connection between that misconduct and the term.
  

Id. (quoting Restatement (Second) of Contracts § 
178(3) (1981)).
 
        At 
the time of this suit between Westchester and Admiral, neither the Texas 
Legislature nor the Supreme Court of Texas had addressed whether insurance 
coverage for punitive damage awards against nursing homes violates Texas’s 
public policy.  However, a federal district court in Texas had issued its Hartford 
v. Powell opinion, upon which the trial court relied.  Hartford Cas. 
Ins. Co. v. Powell, 19 F. Supp. 2d 678, 696 (N.D. Tex. 1998) (holding that 
any insurance contract that prevents a punitive damage award from having its 
punishment effect would be held void in Texas ).  That court made an “Erie 
guess” that the Texas Supreme Court would hold that, at least in the context 
of third-party coverage for automobile insurance claims, insurance coverage for 
punitive damages is void as against public policy.  Westchester claims that 
the trial judge erred in relying on that opinion in ruling on Admiral’s 
partial summary judgment motion.
        The 
record shows that in a letter to trial counsel, the trial judge stated that he 
“paid particular attention to” the Powell case; however, he did not 
state that he relied on it as authority.  We disagree with Westchester’s 
contention that a Texas trial court may not consider a federal case construing 
Texas law.  Although these cases are not binding as precedent on Texas 
state courts, they may be instructive on state law issues, and state courts are 
not prohibited from considering the federal courts’ reasoning in cases 
determining matters of Texas law.  See Davenport v. Garcia, 834 
S.W.2d 4, 20 (Tex. 1992) (orig. proceeding).
        Because 
neither the legislature nor the supreme court has addressed the public policy 
implications of insurance coverage for punitive damage awards against nursing 
homes, we engage in a similar analysis as the Powell court.  See 
Alma Invs., Inc., 999 S.W.2d at 824.  Several Texas courts, including 
this court, have held that the language in a standard form liability policy 
providing coverage for “sums” or “all sums” an insured becomes required 
to pay as a result of bodily injury or property damage covers punitive damages 
if not otherwise excluded.  See Manriquez v. Mid-Century Ins. Co., 
779 S.W.2d 482, 484 (Tex. App.—El Paso 1989, writ denied) (automobile policy), 
disapproved in part on other grounds, Trinity Universal Ins. Co. v. Cowan, 
945 S.W.2d 819, 823 (Tex. 1997); Am. Home Assurance Co. v. Safway Steel 
Prods. Co., 743 S.W.2d 693, 704-05 (Tex. App.—Austin 1987, writ denied) 
(umbrella liability policies); Home Indem. Co. v. Tyler, 522 S.W.2d 594, 
597 (Tex. Civ. App.—Houston [14th Dist.] 1975, writ ref’d n.r.e.) (uninsured 
motorist coverage), overruled by Milligan v. State Farm Mut. Auto. 
Ins. Co., 940 S.W.2d 228, 232 (Tex. App.—Houston [14th Dist.] 1997, writ 
denied); Dairyland County Mut. Ins. Co. v. Wallgren, 477 S.W.2d 341, 
342-43 (Tex. Civ. App.—Fort Worth 1972, writ ref’d n.r.e.) (automobile 
policy).
        This 
court in Dairyland also considered whether insurance coverage for 
punitive damages was against Texas’s public policy, concluding that coverage 
did not violate public policy for the sole reason that the policy language in 
that case had been “prescribed and approved” by the Insurance Commission, 
now the Texas Department of Insurance (TDI).  477 S.W.2d at 342.  This 
court did not, however, discuss the underlying purposes of punitive damages 
awards, such as punishing the wrongdoer and preventing similar behavior in the 
future, in its public policy discussion.  See Tyler, 522 S.W.2d at 
597. The supreme court has since held that “policy provisions, even if 
TDI-approved, are invalid if they are inconsistent with express statutory 
requirements or purposes.”  Mid-Century Ins. Co. v. Kidd, 997 
S.W.2d 265, 271-72 (Tex. 1999).
        The 
Safway court addressed the public policy issue, holding that a 
corporation should be able to insure itself against the gross conduct of its 
agents.  743 S.W.2d at 703-04.  The court focused on the dual 
objectives of punitive damages: punishment and deterrence.  Id. at 
704.  The court recognized the reasoning of federal courts and other state 
courts that have held insurance coverage for punitive damages is against public 
policy.  Id.  But the court determined that denying such 
coverage does not necessarily promote the punishment of corporate offenders, 
stating,
 
An insurance company that deliberately enters into a contract to provide 
coverage against liability for punitive damages is free to charge additional 
premiums for such coverage, so as to provide a separate fund for the express 
purpose of paying such judgments without “punishing” either the insurance 
company or society.  The insurance company is also free to deny coverage of 
punitive damages altogether.  In the case of an established corporation, it 
is important to note that its inability to obtain such coverage will inevitably 
be passed on to the consumers of its products--who are also innocent.
 
Id.  In addition, 
the court concluded that holding such damages void as against public policy 
would not deter wrongdoers because at the time,  Texas law did not allow 
juries to consider “the defendant's wealth, resources, or insurance coverage 
when assessing . . . damages [of any kind].”  Id.
        After 
the Safway case, Texas’s punitive damages laws began to undergo 
significant change. In 1987, the Texas legislature codified the law regarding 
exemplary damages.  See Act of June 3, 1987, 70th Leg., 1st C.S., 
ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 44-46 (amended 1989, 1995, 1997 & 
2001) (current version at Tex. Civ. Prac. 
& Rem. Code Ann. §§ 41.001-.013).  The next year, the supreme 
court held that evidence of a defendant’s net worth is relevant to the issue 
of punitive damages and, therefore, discoverable.  Lunsford v. Morris, 
746 S.W.2d 471, 471-72 (Tex. 1988) (orig. proceeding), disapproved of on 
other grounds, Walker v. Packer, 827 S.W.2d 833, 841-42 (Tex. 1992). In 
doing so, the court relied on two of the purposes of punitive damages: punishing 
the wrongdoer and deterring the same or similar future conduct.  Id.
        In 
June 1994, the Supreme Court of Texas issued its landmark opinion in Transportation 
Insurance Co. v. Moriel. 879 S.W.2d 10 (Tex. 1994).  As part of its 
analysis in that case, the court stated that “[t]he legal justification for 
punitive damages is similar to that for criminal punishment” and that 
“punitive damages are levied for the public purpose of punishment and 
deterrence.”  Id. at 16-17.  While Texas law before Moriel 
held that the general purpose of punitive damages was to punish the wrongdoer, see 
Smith v. Sherwood, 2 Tex. 461, 463-64 (1847), Flanagan v. Womack, 54 
Tex. 45, 50 (1880), and Cotton v. Cooper, 209 S.W. 135, 138 (Tex. 
Comm’n App. 1919, judgm’t adopted), other cases suggested that punitive 
damages might also serve a compensatory function, see Traweek v. Martin-Brown 
Co., 79 Tex. 460, 14 S.W. 564, 565-66 (1890), Hofer v. Lavender, 679 
S.W.2d 470, 474-75 (Tex. 1984), and Qualicare of East Texas, Inc. v. Runnels, 
863 S.W.2d 220, 224 (Tex. App.—Eastland 1993, writ dism’d). Powell, 
19 F. Supp. 2d at 683.  The Moriel court clarified the purpose of 
punitive damages in Texas, stating that “[o]ur duty in civil cases . . ., like 
the duty of criminal courts, is to ensure that defendants who deserve to be 
punished in fact receive an appropriate level of punishment.” Moriel, 
879 S.W.2d at 17 (emphasis added).  However, Moriel also recognized 
that the civil practice and remedies code, which governs the imposition of 
punitive damages, at that time defined exemplary damages as “any damages 
awarded as an example to others, as a penalty, or by way of punishment.  
‘Exemplary damages’ includes punitive damages.”  See Act of 
June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 44 
(amended 1995).
        In 
response to Moriel, the legislature revised the statutory provisions 
regarding exemplary damages during the 1995 legislative session.  See 
Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 
108-13.  Importantly, the definition of exemplary damages was revised.  
The 1995 legislation deleted the words “as an example to others,” leaving 
the definition of exemplary damages as “any damages awarded as a penalty or by 
way of punishment.”  See Act of April 11, 1995, 74th Leg., R.S., 
ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109.  However, the 1995 amendments 
apply only to a cause of action accruing on or after September 1, 1995 and are 
thus inapplicable here. Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 2, 
1995 Tex. Gen. Laws 108, 113.
        In 
addition, beginning in 1994, Texas courts of appeals began to re-examine whether 
insurance coverage for punitive damages is void as against public policy in the 
context of uninsured and underinsured motorist claims.  Since then, several 
courts have held that punitive damages are uninsurable in these contexts. Milligan, 
940 S.W.2d at 232; State Farm Mut. Auto. Ins. Co. v. Shaffer, 888 
S.W.2d 146, 149 (Tex. App.—Houston [1st Dist.] 1994, writ denied); Vanderlinden 
v. USAA Prop. & Cas. Ins. Co., 885 S.W.2d 239, 242 (Tex. 
App.—Texarkana 1994, writ denied).  The Milligan court held that 
the objectives of punishment and deterrence cannot be accomplished in an 
uninsured motorist claim because the wrongdoer is not even involved. 940 S.W.2d 
at 231.  The court went on to distinguish the Safway case on the 
ground that “the policy considerations which permit an insurer to obligate 
itself for punitive damages based on the conduct of its insured are different 
than those where uninsured motorist coverage is at issue.”  Id. at 
232 (quoting Safway’s holding that “[a]s long as insurance companies 
are willing, for a price, to provide protection against liability for punitive 
damages to corporations they deem ‘good risks,’ . . . we see no reason why 
these contracts should not be enforced”).
        Courts 
holding that insurance coverage for punitive damages violates public policy 
generally do so on the theory that wrongdoers should not be shielded from the 
consequences of their acts.  See Lee R. Russ, Couch on Insurance 3d § 
101:29, at 101-99 (2001).[6] As noted by the Powell 
court, this view was described by the Fifth Circuit in Northwestern National 
Casualty Co. v. McNulty:
 
Where a person is able to insure himself against punishment he gains a freedom 
of misconduct inconsistent with the establishment of sanctions against such 
misconduct.  It is not disputed that insurance against criminal fines or 
penalties would be void as violative of public policy.  The same public 
policy should invalidate any contract of insurance against the civil punishment 
that punitive damages represent.

                The 
policy considerations in a state where . . . punitive damages are awarded for 
punishment and deterrence, would seem to require that the damages rest 
ultimately as well [as] nominally on the party actually responsible for the 
wrong.  If that person were permitted to shift the burden to an insurance 
company, punitive damages would serve no useful purpose.  Such damages do 
not compensate the plaintiff for his injury, since compensatory damages already 
have made the plaintiff whole.  And there is no point in punishing the 
insurance company; it has done no wrong.  In actual fact, of course, and 
considering the extent to which the public is insured, the burden would 
ultimately come to rest not on the insurance companies but on the public, since 
the added liability to the insurance companies would be passed along to the 
premium payers.  Society would then be punishing itself for the wrong 
committed by the insured.
  
307 F.2d 432, 440-41 (5th Cir. 
1962), superseded in part by VA. 
Code Ann. § 38.2-227 (Michie, Westlaw through 2004 Special Sess. II).  
One commentator has suggested that “[t]o the extent this rationale is based on 
the need to deter future wrongful conduct, it underestimates the impact that a 
large payment by an insurer would have on the insured’s ability to obtain 
future insurance coverage, and the amount of premiums that would have to be 
paid.”  Russ, supra, 
§ 101:29, at 101-99.  In other words, the insured wrongdoer has not only 
paid premiums for the coverage, but will likely pay greater premiums after an 
insurer has paid a claim or will not be able to obtain insurance at all.
        Further, 
as the Powell court noted, a competing public policy is the right of 
parties to enter into contracts freely. Powell, 19 F. Supp. 2d at 693. 
The Supreme Court of Texas has held that “contracts, when entered into freely 
and voluntarily, shall be held sacred, and shall be enforced by courts of 
justice.” Missouri, K. & T. Ry. v. Carter, 95 Tex. 461, 68 S.W. 
159, 164 (1902); see also Lawrence, 44 S.W.3d at 553 (noting that the 
Texas Supreme Court has “long recognized a strong public policy in favor of 
preserving the freedom of contract” and that courts “must exercise judicial 
restraint in deciding whether to hold arm’s-length contracts void on public 
policy grounds”).  In addition, at least one trial court has 
characterized Texas’s public policy regarding insurance as follows: “Texas 
has a strong public policy of enforcing its insurance policies and requiring 
insurers to step up to the plate with respect to their insureds and properly 
pay. . . . We have very strong public policies about not letting insurance 
companies back off of their obligations.” Am. Intern. Specialty Lines Ins. 
Co. v. Triton Energy Ltd., 52 S.W.3d 337, 341-42 (Tex. App.—Dallas 2001, 
pet. dism'd w.o.j.) (affirming trial court’s order enjoining California 
declaratory judgment action to determine whether insurance policy provided 
coverage for punitive damages).
        Texas’s 
public policy regarding coverage for punitive damages under professional medical 
liability policies in particular is found in the insurance code.  See 
Tex. Ins. Code Ann. art. 5.15-1 
(Vernon 1981 & Supp. 2004-05).  In 1977 the Texas legislature enacted 
article 5.15-1, section 8 of the insurance code, which provided that “[n]o 
policy of medical professional liability insurance issued to or renewed for a 
health care provider or physician in this state may include coverage for 
punitive damages that may be assessed against the health care provider or 
physician.” Medical Liability and Insurance Improvement Act, 65th Leg., R.S., 
ch. 817, § 31.01, 1977 Tex. Gen. Laws 2039, 2056 (amended 1987, 1997 & 
2001) (current version at Tex. Ins. Code 
Ann. art. 5.15-1, § 8).  “Health care provider” was defined as,
 
any person, partnership, professional association, corporation, facility, or 
institution licensed or chartered by the State of Texas to provide health care 
as a registered nurse, hospital, dentist, podiatrist, chiropractor, optometrist, 
blood bank that is a nonprofit corporation chartered to operate a blood bank and 
which is accredited by the American Association of Blood Banks, or not-for-profit 
nursing home, or an officer, employee, or agent of any of them acting in the 
course and scope of his employment.
  
Id. at 2055 (amended 
2001) (current version at Tex. Ins. Code 
Ann. art. 5.15-1, § 2) (emphasis added).  The 1977 legislation was 
passed in order to alleviate a medical insurance crisis and its stated purpose 
was to:
 
improve and modify the system by which health care liability claims are 
determined in order to:
 
. . . .
 
(2) decrease the cost of 
[health care] claims and assure that awards are rationally related to actual 
damages;
 
. . . .
 
(4) make available to 
physicians, hospitals, and other health care providers protection against 
potential liability through the insurance mechanism at reasonably affordable 
rates;
 
. . . .
 
(6) make certain modifications 
in the medical, insurance, and legal systems in order to determine whether or 
not there will be an effect on rates charged by insurers for medical 
professional liability insurance; and
 
(7) make certain modifications 
to the liability laws as they relate to health care liability claims only and 
with an intention of the legislature to not extend or apply such modifications 
of liability laws to any other area of the Texas legal system or tort law.
 
Medical Liability and 
Insurance Improvement Act, 65th Leg., R.S., ch. 817, § 1.02(b), 1977 Tex. Gen. 
Laws 2039, 2040-41 (emphasis added). Another purpose was to penalize and deter 
the intentional or grossly negligent wrongdoer. See Horizon/CMS Healthcare 
Corp. v. Auld, 34 S.W.3d 887, 895 (Tex. 2000) (citing Texas Medical Professional Liability Study 
Commission, Final Report to the 65th Legislature 25 (Dec. 1976) and Hearings 
on Tex. H.B. 722 Before the House Comm. on State Affairs, 65th Leg., R.S. 
(Feb. 14, 1977) (Rep. Davis’s statement in reference to the proposed 
prohibition in the Insurance Code that “it’s against social policy to permit 
someone to insure against their own gross negligence or a willful injury of 
another”)).
        In 
1987, the legislature amended section 8 to provide that “the [insurance] board 
may approve an endorsement form that provides for coverage for punitive damages 
to be used on a policy of medical professional liability insurance issued to a hospital.”  
Act of June 3, 1987, 70th Leg., 1st C.S., ch. 1, § 7.01, 1987 Tex. Gen. Laws 1, 
36 (amended 1997 & 2001) (emphasis added).  The legislature extended 
the ability to obtain an endorsement for punitive damages to not-for-profit 
nursing homes in 1997.  See Act of May 21, 1997, 75th Leg., R.S., 
ch. 746, § 1, 1997 Tex. Gen. Laws 2451, 2451 (amended 2001).
        It 
was not until 2001 that the legislature added for-profit nursing homes to 
the list of entities prohibited from obtaining coverage for punitive damages under 
a primary insurance policy, but at the same time the legislature included 
them in the list of entities that could obtain a specific endorsement for 
such coverage.  See Act of May 27, 2001, 77th Leg., R.S., ch. 
1284, §§ 5.01, 5.02, 2001 Tex. Gen. Laws 3083, 3085.  The 2001 amendments 
were intended as “temporary solutions” to “facilitate the efficient 
recovery of both for-profit and not-for-profit private long-term care 
facilities,” which the legislature acknowledged were in crisis.  See 
Act of May 27, 2001, 77th Leg., R.S., ch. 1284, § 1.02(a), (c), 2001 Tex. Gen. 
Laws 3083, 3083.  Furthermore, the introduction to the 2001 amendments 
states that,
 
[w]ith respect to the legal concepts incorporated in the measures contained in 
this Act, the legislature does not intend for these concepts to be applied 
outside the realm of long-term care.  Because the application of the 
measures contained in this Act in relation to these legal concepts is temporary 
and because of the extraordinary complexity and uniqueness of the crisis facing 
nursing homes, these measures should not be construed as the legislature’s 
interpretation of the current law applicable to these legal concepts. In 
enacting the extraordinary measures contained in this Act, the legislature 
specifically rejects any suggestion that these measures represent solutions that 
are appropriate for any area involving liability insurance, insurance practices, 
or medical care other than long-term care facilities.
 
Act of May 27, 2001, 77th 
Leg., R.S., ch. 1284, § 1.02(d), 2001 Tex. Gen. Laws 3083, 3083 (emphasis 
added).  Thus, it is clear that before the effective date of the 2001 
amendments, a for-profit nursing home, such as PeopleCare, was not prohibited by 
the legislature from obtaining insurance coverage for punitive damages awards 
under a professional medical liability insurance policy, and after the 2001 
amendments, it is permitted to do so if the nursing home specifically obtains an 
endorsement for such coverage. See Tex. 
Ins. Code Ann. art. 5.15-1, § 8.
        Admiral 
also contends that because Moriel “heightened [the] level of 
culpability required to support an award of punitive damages,” and the trend 
for Texas courts since Moriel has been to hold that punitive damages are 
uninsurable, allowing insurance coverage for punitive damages under Admiral’s 
policy contravenes public policy.
        We 
agree that public policy is subject to change; it is not static.  See 
Pawson v. State, 865 S.W.2d 36, 39 n.6 (Tex. Crim. App. 1993); Featherlite 
Bldg. Prods. Corp. v. Constructors Unlimited, Inc., 714 S.W.2d 68, 70 (Tex. 
App.—Houston [14th Dist.] 1986, writ ref’d n.r.e.); Kennedy v. Laird, 
503 S.W.2d 664, 665 (Tex. Civ. App.—Houston [1st Dist.] 1973, no writ).  
The Powell opinion aptly traces the evolution of this state’s public 
policy regarding the purposes of punitive damages and the standards for imposing 
them.  19 F. Supp. 2d at 682-85, 687-91, 693-96.  However, the supreme 
court has also clearly stated that an agreement does not violate public policy 
if it does not contravene a positive statute or well-established rule of law.  
See, e.g., Grizzle, 96 S.W.3d at 250.
        Further, 
contrary to Admiral’s reliance on Powell, and its argument that Powell’s 
“Erie” conclusion that Texas’s current public policy is against the 
insurability of punitive damages, we are not faced with the issue of current 
insurability but with a policy originally issued in 1993, an occurrence in 1994, 
and a suit and settlement in 1995.  At all relevant times in the Cagle 
suit—the effective dates of the Admiral policy,[7] 
the time during which PeopleCare both treated and failed to treat Beulah, and 
when the case was filed, negotiated, and tried—the legislature authorized the 
imposition of exemplary damages as “an example to others.” Act of June 3, 
1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 44 (defining 
exemplary damages as “any damages awarded as an example to others, as a 
penalty, or by way of punishment” (emphasis added)), 45 (providing that 
chapter 41 of the civil practice and remedies code governed the imposition of 
exemplary damages in a personal injury case) (both amended in 1995).
        Additionally, 
Moriel did not address the insurability of punitive damages; insurance 
coverage was not at issue in that case.  The legislative change to the 
definition of exemplary damages (as being solely for penalty or punishment) did 
not apply to causes of action accruing before September 1, 1995. See Act 
of April 11, 1995, 74th Leg., R.S., ch. 19, § 2, 1995 Tex. Gen. Laws 108, 113.  
Therefore, when the Cagle case was decided—even though PeopleCare’s gross 
negligence was determined under the Moriel standard—the trial judge 
could have awarded punitive damages for the sole purpose of making an example of 
PeopleCare, rather than punishing PeopleCare for its grossly negligent treatment 
of Beulah.
        Whether 
or not the party against whom punitive damages are imposed actually pays (or its 
insurance company pays) such an award is irrelevant when the purpose of the 
award is to make an example of the party.  It is the mere fact that the 
damages are assessed that sets the example to the public and other similarly 
situated parties.  Thus, the trial court’s imposition of punitive damages 
would not have violated one of the express statutory purposes then in effect as 
to the Cagle case. In addition, the insurance code listed numerous entities that 
were prohibited from obtaining such coverage, but for-profit nursing homes were 
not listed.  See Medical Liability and Insurance Improvement Act, 
65th Leg., R.S., ch. 817, § 31.01, 1977 Tex. Gen. Laws 2039, 2056.  
Consequently, we cannot say that coverage for such damages under Admiral’s 
policy was void as against public policy at that time.
        Further, 
we decline to address Admiral’s argument that insurability of punitive damages 
is currently against public policy even though Westchester agreed with that 
proposition on rehearing. The present viability of insured punitive damages is 
not before us.  If we were to decide the case on that basis, we would be 
deciding it on grounds not relevant to the outcome (because, as we have already 
explained, the pertinent inquiry is whether Admiral’s policy covered the 
Cagles’ claim for punitive damages when the claim was pending) and without the 
benefit of arguments from a party representing the interests of an insured (or 
the insured public of this state).[8]  We are 
prohibited from rendering advisory opinions and have no jurisdiction to do so. Tex. Const. art. II, § 1; Brown v. 
Todd, 53 S.W.3d 297, 302 (Tex. 2001); Valley Baptist Med. Ctr. v. 
Gonzalez, 33 S.W.3d 821, 822 (Tex. 2000).  Therefore, we decline to 
address whether insurance coverage for punitive damages currently violates this 
state’s public policy.[9]
        Lastly, 
we must address the assertions of the concurring and dissenting opinion.  
Because Westchester, as PeopleCare’s equitable subrogee, stands in the shoes 
of its insured, it may bring any cause of action against Admiral that PeopleCare 
could have brought.  Westchester obviously has “standing” to bring a Stowers 
cause of action against Admiral. Contrary to what the concurring and dissenting 
opinion says, Admiral’s standing is irrelevant because it is not the claimant 
in this Stowers cause of action.  Likewise, Westchester’s Stowers 
action presents a real, live justiciable controversy, not an abstract question 
of law.  The concurring and dissenting opinion confuses Admiral’s 
standing with Admiral’s failure to raise its public policy scope of coverage 
issue sooner.  That is a question of estoppel, not standing.  And 
since Westchester never claimed Admiral was estopped from challenging the Stowers 
scope of coverage prong, it is barred from raising it here.
        Because 
we have determined that coverage for punitive damages under Admiral’s 
professional liability policy would not have violated one of the express 
statutory definitions of exemplary damages during the period relevant to 
Westchester’s Stowers claim, and based on our review and consideration 
of judicial decisions regarding punitive damages, we hold that insurance 
coverage under Admiral’s policy for the punitive damages awarded to the Cagles 
and against PeopleCare was not void as against the public policy of Texas at 
that time.
        Because 
insurance coverage for punitive damages under Admiral’s policy was not void as 
against public policy at the relevant time, the trial court erred in determining 
that the Admiral policy did not provide coverage for punitive damages; 
therefore, Westchester’s recovery should not have been limited to only those 
amounts attributable to the compensatory damages exceeding Admiral’s policy 
limits.
        Based 
on the foregoing, we conclude that the trial court erred in granting Admiral 
partial summary judgment on the public policy issue.  Because 
Westchester’s recovery should have been reduced only by Lola’s treble 
damages and related attorneys’ fees (an amount equal to one third of the 
treble damages), Admiral’s election of the settlement credit did not preclude 
Westchester from recovering damages from Admiral that were attributable to a 
potential punitive damages award.  Therefore, the trial court erred in 
granting a directed verdict for Admiral on that basis.
Other Grounds for Directed Verdict
        Admiral 
contends that even if the trial court erred in granting a directed verdict based 
on its partial summary judgment, the directed verdict was proper for other 
reasons.  A directed verdict is proper only under the following limited 
circumstances as a matter of law: (1) when the evidence conclusively establishes 
the right of the movant to judgment or negates the right of the opponent, or (2) 
when the evidence is insufficient to raise a fact issue that must be established 
before the opponent is entitled to judgment.  Compare Tex. R. Civ. P. 268 with Tex. R. Civ. P. 301; see Prudential 
Ins. Co. v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000); 
Boswell v. Farm & Home Sav. Ass'n, 894 S.W.2d 761, 768 (Tex. App.—Fort 
Worth 1994, writ denied).  In reviewing a directed verdict, we must view 
the evidence in the light most favorable to the party against whom the verdict 
was rendered and disregard all contrary evidence and inferences. Szczepanik 
v. First S. Trust Co., 883 S.W.2d 648, 649 (Tex. 1994); White v. S.W. 
Bell Tel. Co., 651 S.W.2d 260, 262 (Tex. 1983); Heinsohn v. Trans-Con 
Adjustment Bureau, 939 S.W.2d 793, 795 (Tex. App.—Fort Worth 1997, writ 
denied). Further, we must determine if there is any conflicting evidence of 
probative value that raises a material fact issue. See Szczepanik, 
883 S.W.2d at 649; White, 651 S.W.2d at 262. If there is any such 
evidence on any theory of recovery, a determination of that issue is for the 
jury.  See Szczepanik, 883 S.W.2d at 649; Cano v. N. Tex. 
Nephrology Assoc., P.A., 99 S.W.3d 330, 339 (Tex. App.—Fort Worth 2003, no 
pet.).
        An 
appellate court must affirm a trial court’s directed verdict, regardless of 
the grounds asserted by the movant or upon which the trial court granted the 
directed verdict, if the record establishes any ground that entitles the movant 
to judgment as a matter of law.  Crescendo Invs., Inc. v. Brice, 61 
S.W.3d 465, 472 (Tex. App.—San Antonio 2001, pet. denied); Gonzales v. 
Willis, 995 S.W.2d 729, 740 (Tex. App.—San Antonio 1999, no pet.) (op. on 
reh'g); Smith v. Guthrie, 557 S.W.2d 163, 164-65 (Tex. Civ. App.—Fort 
Worth 1977, writ ref’d n.r.e.); Granato v. Bravo, 498 S.W.2d 499, 
502-03 (Tex. Civ. App.—San Antonio 1973, no writ).  A directed verdict 
for a defendant is proper in two situations: when a plaintiff fails to present 
evidence raising a fact issue essential to the plaintiff’s right of recovery 
and when a plaintiff admits or the evidence conclusively establishes a defense 
to the plaintiff’s cause of action.  Prudential Ins. Co., 29 
S.W.3d at 77; Johnson v. Scott Fetzer Co., 124 S.W.3d 257, 262 (Tex. 
App.—Fort Worth 2003, pet. denied); Cano, 99 S.W.3d at 338.
        Because 
the review of a directed verdict is essentially a legal sufficiency review and 
we must affirm a directed verdict even if on different grounds than the trial 
court’s partial summary judgment, we must consider Admiral’s other theories 
that might support the verdict.
        No Demand Within Policy Limits
        Admiral 
contends that, regardless of the propriety of the partial summary judgment on 
which the directed verdict was based, the directed verdict was proper because 
Westchester presented no evidence that the Cagles made a settlement demand that 
triggered Admiral’s duty to settle under Stowers.  An insurer has 
no duty to settle a third-party claim unless it has received a demand within its 
policy limits. Garcia, 876 S.W.2d at 849.  A demand above policy 
limits, even though reasonable, does not trigger the Stowers duty to 
settle. Id.
        The 
evidence in this case shows that Kimberly Robinson, counsel for PeopleCare, and 
Dusty Fillmore III, counsel for the Cagles, first discussed settlement of the 
case in February 1995 after a pretrial conference.  At that time, Fillmore 
told Robinson that the Cagles would be seeking PeopleCare’s policy limits.  
Later that month, Robinson sent Fillmore a “dec page” for the Admiral 
policy, which showed that Admiral’s policy limits were inclusive of costs and 
expenses; in other words, the policy was a “burning” or “eroding”[10] policy in which the policy limits are diminished by 
defense costs and expenses.  Fillmore testified that he was unsure then 
whether the dec page was for the entity that actually owned Heritage Western 
Hills Nursing Home because several PeopleCare entities were listed on the dec 
page.  Fillmore orally communicated to Robinson on at least one other 
occasion that the Cagles were seeking PeopleCare’s policy limits.  A 
letter Robinson wrote Admiral on April 25, 1995 indicates that Fillmore was 
“[b]asically . . . willing to settle for the full policy limits.”
        Robinson 
testified at trial that she did not construe any of these conversations to be 
settlement offers because “he [Fillmore] really didn’t approach me with the 
topic like you would a normal settlement demand.  In addition, his comments 
were along the lines of, well, I can’t believe that you don’t think this is 
a $1,000,000 case. . . . Those are the types of discussions that we had.”  
Beverly Godbey, lead counsel for PeopleCare, also testified that Robinson told 
her
 
that on several occasions she [Robinson] had talked to [Fillmore] about 
settlement and just about his view of the case, and very consistently he would 
express a very high opinion about his cases and say I think this is a policy 
limits case.
. . . .
 
Not in terms of it being an 
actual offer that we could accept, but just as – as the way plaintiff’s 
lawyers sometimes talk about their cases.
 
. . . .
 
Every time he talked about it, 
he talked about it in the future, we’re going to be looking for this, we’re 
going to be seeking this, we’re going to be asking for this, and this was the 
same way he was conveying it to [Robinson], as I remember, not as something that 
he would presently take but something that he was going to do in the future.
 
        On 
July 19, 1995, Fillmore wrote Robinson a letter in which he asked “what amount 
of insurance is left, out of the aggregate, on the primary policy.”  
Fillmore testified at trial that he was trying to confirm what insurance was 
still available because of the concern that PeopleCare-affiliated entities other 
than Heritage Western Hills may have been covered under the policy and the 
possibility that the aggregate may have been depleted by other claims.  
Robert Schlegel, the president of PeopleCare Centers of Texas, Inc., testified 
at his deposition in July 1995 that “most of the coverage was still available 
under the policy.”  Robinson sent Fillmore a letter in response stating 
that “unless I am mistaken, I recall Mr. Schlegel testifying that the entire 
$2 million aggregate on the primary insurance policy was still in place.  
Indeed, that is the information received from Admiral Insurance Company.  
In any event, I am sure that you will find that the insurance policies in place 
are sufficient to cover Ms. Cagle’s claims.”  Fillmore testified that 
he thought this meant the full $1,000,000 limits of the primary policy were 
available for the Cagles’ claims.
        Fillmore 
sent Robinson two letters dated August 1, 1995, in which he stated that the 
Cagles’ settlement demand would exceed the primary policy’s coverage limits.  
For this reason, he expressed concern that Westchester be notified about the 
mediation and have a representative present.  On August 9, 1995, Fillmore 
sent Robinson a written settlement proposal, which stated, “[W]e are willing, at 
this time, to settle this case for the policy limits of the primary 
insurance policy: $1,000,000.00.  I trust that you will apprise the excess 
carrier of the fact that this case can be settled, at this time, within 
the limits of the primary insurance policy.”  Fillmore testified that he 
“made the demand for the policy limits of the primary insurance company, 
which at that time we understood to be $1,000,000.” [Emphasis added].
        In 
discussing the demand letter at trial, Fillmore stated, “We made a $1,000,000 
demand and then they pop up later and say, oh, by the way, there wasn’t 
$1,000,000 available, so you did not make a—an appropriate Stowers [sic] 
demand.”  According to Fillmore, the demand assumes that “the amount of 
the primary policy is $1,000,000 and that the full 1,000,000 is available.”  
However, in response to cross-examination asking if the demand was conditioned 
upon the policy limits being $1,000,000, Fillmore stated that
 
what I’m setting out is basically that we are willing to settle for the 
primary insurance policy limits, colon, and that sets out what they have been 
represented to us to be, $1,000,000.
 
And then the next sentence 
tells them that we are willing to [settle] within the limits of the insurance 
policy.
 
So, if you mean it’s 
conditioned on it being a million, and if it’s not a million, then we 
wouldn’t be settling, I don’t believe that is correct.
 
Fillmore testified that he 
thought the policy limits were $1,000,000 because “that’s what had been 
represented to us to be available for the client.”  He further testified 
that he felt he had “basically been tricked into not making a Stowers [sic] 
demand or not making a demand within their policy limits.”
        On 
August 15, 1995, Admiral sent PeopleCare a letter advising that under the terms 
of the policy PeopleCare’s written consent was required in order to settle the 
claim.  PeopleCare responded in writing on August 16, consenting to 
settlement “if it can be negotiated within [the] policy limit.”
        The 
case went to mediation on August 16, 1995. H. Dustin Fillmore II (Fillmore II), 
Fillmore’s father and law partner, attended the mediation.  According to 
Fillmore II, his son made an opening demand “right at $1,000,000 or whatever 
the coverage was.”  He testified that he and Fillmore were aware of the 
eroding nature of the policy when they attended the mediation, but that
 
[t]he problem was [he and Fillmore] were getting subsequent information telling 
[them] that the coverage was 1,000,000.  So, that’s why the demand was 
couched the way it was.  If it’s – If you got 1,000,000, we want that.  
That’s our demand.  If it’s not $1,000,000, if it’s eroded down to 
950 or 990 or whatever, then that’s what we want.
 
Fillmore II also testified 
that
 
[o]ur demand at the mediation 
was, if it – if you have $1,000,000, that’s what we’ll settle the case 
for.  If it’s less than 1,000,000, if it’s depreciated some amount, 
what we want is the – what’s left on the primary policy of insurance.   
That’s what we’re willing to settle the case for.
 
. . . .
 
[T]hose were the terms in 
which . . . the demand was communicated.
 
If you’ve got $1,000,000 
coverage, we want the $1,000,000 to settle the claim.  If you don’t have 
$1,000,000, if it has been depreciated, that coverage has gone down some, 
we’ll take that.  Whatever you’re telling us –
 
You still have $1,000,000. So 
we’ll take that. If you don’t have it, then we’ll take what’s left.[11]
 
        Fillmore, 
on the other hand, testified that “we didn’t have any discussions at the 
mediation about the defense cost being subtracted from the policy” and 
“[h]ad we known that at the time, we would have made a demand within 
[whatever] was available at that time, but we didn’t.”  In a subsequent 
letter to Godbey, Fillmore stated, “We made no settlement demand of a 
million dollars at mediation; we simply asked the Defendant to make an offer and 
see how close to one million dollars it could come in order to settle this case.” 
[Emphasis added.]
        At 
the mediation, PeopleCare made an opening offer of $40,000.[12]  
Fillmore informed the mediator that unless PeopleCare made an offer in the 
$500,000 range, there was no reason to continue mediating.  The mediator 
returned, saying that PeopleCare would not increase its offer and would never 
make a $500,000 offer in the case.  According to Godbey, she and Fillmore 
II met personally outside the presence of the mediator and
 
talked about the fact that we couldn’t even pay the $1,000,000 even if we 
wanted to pay the $1,000,000 because this was a wasting policy, and he said he 
understand [sic] that. He said that didn’t make any difference.  What he 
was out there to tell me was if we would come up to $500,000, then only under 
that circumstance would they come off $1,000,000.
 
. . . .
 
I believe what I ultimately 
did was tell him that I did not have authority to settle the case there but that 
I would be happy to talk with my client and see if there’s anything else we 
can do, and he basically closed the mediation by saying, well, if you don’t 
have $1,000,000, then you’re going to need to get up just as close to 
1,000,0000 as you can come, or words to that effect.
 
. . . .
 
They never came off their 
$1,000,000 demand.
 
According to Godbey, the 
Fillmores “knew the policy limits were not $1,000,000, and . . . didn’t want 
to come off $1,000,000.”  Thus, the mediation ended without a settlement.
        In 
an August 17, 1995 letter to Admiral, Myrna Schlegel, another officer of 
PeopleCare, wrote, “Also note that the demand for settlement is currently 
within the basic insured amount.  Please attempt to get this account 
settled as soon as possible.”
        The 
record contains another handwritten note made by Guest dated August 22, 1995, in 
which he states, “$1M settlement demand in.”  In an August 24, 1995 
letter to Robinson, Guest writes, “This will confirm receipt by copy of your 
August 10, 1995 letter to Jane Hill of Admiral inclusive of the plaintiff’s 
formal settlement proposal document wherein a $1,000,000 demand is extended.”
        In 
a September 21, 1995 letter to Fillmore, Godbey offered to settle the case for a 
cash payment of $146,000 or an annuity with either a lifetime income of $2,207 
per month with five years guaranteed or a guaranteed income of $2,776 per month 
for five years only.  That same day, Fillmore wrote back to Godbey, stating 
that based on new information in the case, the demand for the Cagles’ claims 
had increased to $1,750,000 for Beulah and $150,000 for Lola.  The letter 
also states, “You were given an opportunity to settle this case within the 
primary policy limits at mediation.”
        On 
September 28, 1995, Godbey wrote a letter to Fillmore indicating that there had 
never been a demand for policy limits in the case.  She stated that 
“[b]oth from our discussions at the mediation and from our interrogatory 
answers, you know that defense costs are subtracted from the policy limits in 
this case.”  Fillmore responded in a letter dated the same day, stating 
that the “only information [he had received] concerning available insurance 
coverage under the primary policy of insurance” was a copy of the policy 
indicating an aggregate of $2,000,000, Mr. Schlegel’s deposition testimony, 
and the July 1995 letter from Robinson. He said further that the Cagles’ 
demands had increased because of costs and new information. The Cagles never 
lowered their demands before trial.
        Gary 
Beck, an insurance expert hired by Westchester, testified that the settlement 
demand in the August 9 letter was a demand within policy limits.  He based 
his opinion on “the letter, 25 years[‘] experience in looking at Stowers 
[sic] demand letters, [and] knowing how a plaintiff lawyer Stowerizes an 
insurance company. “  According to Beck, the letter was a demand within 
the eroding limits of the policy because
 
I think he used the magic words policy limits.  “We will settle for 
policy limits.”  I think that’s a direct quote.
 
So, in my mind, if you’re a 
claims adjuster looking at that, that means policy limits as they may exist from 
time to time.
 
Now, I think the distinction 
that is being made here by the other side is that because there was the 
statement made, $1,000,000, that’s the stated limit on the face of the policy 
for the per occurrence limits, but I think the demand for policy limits gets 
around that, if that’s a quibbling point.
 
        Ricky 
Brantley, the attorney appointed as Beulah’s guardian ad litem in the Cagle 
case, testified that “[b]ased on what [he] had looked at in the file, it was 
[his] opinion that there had been a demand or an offer to settle the case for 
Admiral Insurance’s policy limits.”  His opinion was based on “the 
communications, the settlement demand that was sent at the time of the 
mediation, the letters that were written about what coverage was in effect . . . 
[and] answers to interrogatories.”
        We 
hold that, viewed under the proper standard, there is more than a scintilla of 
evidence to raise a fact issue regarding whether the Cagles made a settlement 
demand within policy limits.  Therefore, we conclude that a directed 
verdict would not have been proper on this ground.
        Ordinarily 
Prudent Insurer Would Not Accept Settlement Offers
        Admiral 
further contends that the directed verdict should be affirmed because an 
ordinarily prudent insurer would not have accepted the terms of the Cagles’ 
premediation $1 million settlement demand.  According to Admiral, an 
ordinarily prudent insurer would only accept a demand within policy limits, 
would not settle without its insured’s consent when the policy requires it to 
first obtain consent, and would not accept an opening, premediation settlement 
demand without attempting to negotiate a lower settlement amount.
        We 
have already determined that a fact issue exists on whether Admiral received a 
policy limits demand from the Cagles. Admiral next claims that it never had the 
opportunity to settle within policy limits because it did not have its 
insured’s consent to do so.  According to Admiral, it did not have notice 
of Myrna Schlegel’s consent to settle within policy limits until after the 
mediation, and at the mediation, Mrs. Schlegel would not allow Godbey and 
Robinson to offer more than $40,000.
        Godbey 
testified that it was her understanding before the mediation that the Schlegels 
had not given Admiral written authorization to settle the case and that the 
issue would need to be discussed at mediation.  Godbey said that at 
mediation, Mrs. Schlegel would not authorize an opening demand of more than 
$40,000.  Godbey said she had no authority from Mrs. Schlegel to make any 
further offer, and there was nothing she and Robinson could do to change Mrs. 
Schlegel’s mind.  Godbey did not learn about Mrs. Schlegel’s letter 
authorizing a settlement within policy limits until after the mediation.
        The 
fax identification information on the top of Mrs. Schlegel’s letter consenting 
to a settlement “within [PeopleCare’s] insurance policy limit” indicates 
it was sent from the “SCHLEGEL OFFICE” on “AUG . . . 99" at 11:58.  
However, the information does not indicate whether it was 11:58 a.m. or p.m. The 
date of the letter is August 16, 1995, but Mrs. Schlegel did not know when the 
letter was sent.  Mrs. Schlegel testified by deposition that she did not 
control the negotiations at mediation; the insurance company did.  She said 
that she told the insurance company “in [her] letters” that she wanted to 
settle for more than $40,000.   Fillmore testified that the initial 
decision after the mediation was that the Cagles would not accept a policy 
limits settlement, but that this decision was not “hard and fast,” and it 
was not until some point after mediation that a policy limits settlement became 
unacceptable.
        We 
hold that Admiral failed to conclusively prove that it did not have an 
opportunity to settle the claim after receiving PeopleCare’s consent.  
Admiral did not attempt to obtain its insured’s consent to settlement until 
the day before mediation even though the parties had been discussing mediation 
since February 1995.  In addition, Fillmore’s testimony indicates it may 
have been possible for Admiral to settle the case for policy limits even after 
the mediation.  Thus, we conclude that a directed verdict was not proper on 
this ground.
        Finally, 
Admiral contends that an ordinarily prudent insurer would not have accepted an 
opening demand for its full policy limits without first attempting to negotiate 
a lower settlement amount. Admiral quotes the following testimony from Ray 
Chester, one of Westchester’s experts, averring that it shows why an 
ordinarily prudent insurer would not have accepted an opening offer of policy 
limits:
 
There was [a] $1,000,000 primary insurance policy.  The plaintiff’s 
lawyer had indicated that he thought it was a policy limits case, that he would 
settle for the primary insurance limits, but then he also agreed to mediate it, 
which is a very clear signal that he will take less than 1,000,000 because if 
you are firm on your 1,000,000 and you ---
 
All you do is you send a Stowers 
letter, and there is reason to mediate because it’s a million or nothing or 
I’m going to trial -- if you sent -- If you make a $1,000,000 demand or policy 
limit demand, as was made in this case, and then you agree to mediate or 
indicate you are willing to settle it for less . . . than policy limits.
 
However, the same expert 
testified that he thought the value of the case exceeded $1,000,000 from the 
beginning.  Another of Westchester’s experts testified that it would not 
have been unreasonable for Admiral to settle for $1,000,000 at the mediation. 
Accordingly, we hold that Admiral failed to conclusively prove that an 
ordinarily prudent insurer would not have accepted the Cagles’ policy limits 
demand; therefore, Admiral was not entitled to a directed verdict on this ground 
either.
        Because 
there remain factual issues as to whether an offer within policy limits was 
tendered and whether an ordinarily reasonable person would accept the offer, 
there are no other bases upon which to affirm the directed verdict.
Conclusion
        Having 
determined under the specific facts of this case that public policy at the time 
the Cagle case was decided did not preclude coverage under Admiral’s policy 
for amounts attributable to punitive damages, that the Admiral policy and 
professional malpractice endorsement did not exclude punitive damages from 
coverage, and that the evidence is sufficient to raise a fact issue regarding 
whether Admiral received a proper Stowers demand and whether an 
ordinarily prudent insurer would have settled the case for policy limits, we 
reverse the part of the trial court’s partial summary judgment determining 
that public policy at the time the Cagle case was tried and settled precluded 
coverage under Admiral’s policy for punitive damages and excluding from 
Westchester’s potential damages recovery the amount of Westchester’s 
settlement contribution attributable to punitive damages on Beulah’s claim.  
We affirm the part of the trial court’s partial motion for summary judgment 
excluding DTPA treble damages and related attorneys’ fees from any potential 
damages award as unchallenged.  Because Admiral’s settlement credit is 
less than the amount of Westchester’s potential recovery (i.e., the portion of 
Westchester’s settlement contribution attributable to the Cagles’ 
compensatory damages and punitive damages on Beulah’s claim), we reverse the 
trial court’s directed verdict in Admiral’s favor[13] 
and remand the case for a new trial on Westchester’s Stowers claim.
 
 
                                                                  TERRIE 
LIVINGSTON
                                                                  JUSTICE
  
 
 
EN BANC
 
CAYCE, C.J. filed a concurring 
and dissenting opinion in which HOLMAN, J. joins.
 
MCCOY, J. recused
 
DELIVERED: December 2, 2004
 


 
COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
 
NO. 2-01-227-CV
 
 
WESTCHESTER 
FIRE INSURANCE COMPANY                           APPELLANT
 
V.
 
ADMIRAL 
INSURANCE COMPANY                                              APPELLEE
 
------------
 
FROM 
THE 48TH DISTRICT COURT OF TARRANT COUNTY
 
------------
 
CONCURRING AND 
DISSENTING OPINION ON REHEARING
 
------------
        I 
concur with the majority’s holding that gross negligence is a covered claim 
under the language of Admiral’s insurance contract with PeopleCare, and I 
agree that the question of whether it is now against public policy to insure 
punitive damages is not before us. I dissent, however, to the majority’s 
advisory opinion holding that it was not against public policy to insure against 
punitive damages on or before 1995.
        To 
invoke the subject matter jurisdiction of the trial court for the purpose of 
deciding whether it was against public policy for Admiral to insure 
PeopleCare’s punitive damages on or before 1995, the party challenging the 
legality of insuring punitive damages, Admiral, must have standing to assert the 
complaint.[1]  Standing is implicit in the 
concept of subject matter jurisdiction and stems from two constitutional 
limitations on that jurisdiction: the separation of powers doctrine and the open 
courts provision.[2]  The separation of 
powers doctrine prohibits courts from issuing advisory opinions.[3]  The distinctive feature of an advisory 
opinion is that it decides an abstract question of law without binding the 
parties. Rather than remedying an actual or imminent harm, an advisory opinion 
addresses only a hypothetical injury.[4]  
Texas courts have no jurisdiction to render such opinions.[5]
        Standing 
is also an aspect of the open courts provision of the Texas Constitution, which 
contemplates access to the courts for those litigants suffering an injury.  
Specifically, the open courts provision provides:
 
All courts shall be open, and every person for an injury done him, . . . shall have remedy by due 
course of law.[6]
 
Thus, 
there must be an actual, not merely hypothetical or generalized, grievance.[7]
        As 
a ground for its motion for partial summary judgment, Admiral argued that 
Westchester is precluded from recovering on its Stowers[8] action against Admiral for negligently refusing to 
settle the Cagles’ gross negligence claim against PeopleCare, because it was 
against public policy to insure punitive damages at that time.  Admiral 
contends that punitive damages were uninsurable at that time because the 
underlying social purpose of punitive damages was, and is, to punish wrongdoers 
and prevent similar behavior against society in the future—an objective that 
would be frustrated if wrongdoers were permitted to insure against their own 
grossly negligent conduct or willful injury to another.  The trial court 
expressly granted Admiral’s motion on this ground declaring:
 
[I]nsurance coverage for punitive damages, now and at the time in question, 
violates the public policy of the State of Texas.  Accordingly, coverage 
for punitive damages under the Admiral insurance policy is void.
 
        In 
reversing the trial court’s judgment, a majority of this court has rendered 
the following pronouncement:
 
Whether or not the party against whom punitive damages are imposed actually pays 
(or its insurance company pays) such an award is irrelevant when the purpose of 
the award is to make an example of the party.  It is the mere fact that the 
damages are assessed that sets the example to the public and other similarly 
situated parties. . . . In addition, the insurance code listed numerous entities 
that were prohibited from obtaining such coverage, but for-profit nursing homes 
were not listed.  Consequently, we cannot say that coverage for such 
damages under Admiral’s policy was void as against public policy at that time.[9]
 
I 
do not believe we have jurisdiction to make this public policy decision because 
Admiral has no standing in this case to challenge the insurability of punitive 
damages on public policy grounds.  I, therefore, dissent to this part of 
the majority’s opinion.
        The 
question decided by the trial court—whether “insurance coverage for punitive 
damages . . . at the time in question, violates the public policy of the State 
of Texas”—is an abstract question of law that has no binding effect on 
either party to this case.  No insured of either insurance company is a 
party to the case and no party is seeking a judgment that would allow or deny 
coverage of an insured’s punitive damage award.[10]  
Consequently, the trial court’s judgment remedied no actual or imminent harm 
to the public, or to a party, resulting from the potential coverage or 
noncoverage of a punitive damage award. It was, therefore, an advisory judgment 
which the trial court had no subject matter jurisdiction to render.
        “Our 
jurisdiction over the merits of an appeal extends no further than that of the 
court from which the appeal is taken.”[11]  
Because the trial court lacked subject matter jurisdiction to decide the 
hypothetical question of whether insurance coverage for punitive damages 
violated public policy on or before 1995, so do we.[12]
        The 
only real issue between the parties to this case is whether Westchester is 
entitled under Stowers to recover damages from Admiral for its alleged 
negligence in refusing to settle a claim covered by the language of Admiral’s 
insurance contract with PeopleCare.  Whether Admiral violated public policy 
when it agreed to insure PeopleCare against its own gross negligence is 
immaterial to Westchester’s right to recover against Admiral under Stowers.
        The 
majority misunderstands the nature of the standing problem.  The issue is 
not whether Westchester has standing to bring its Stowers action, 
as the majority believes, but whether Admiral has standing to challenge 
the legality insuring PeopleCare against punitive damages prior to 1995.  
Admiral cannot rely on Westchester’s standing to bring a Stowers action 
for the separate standing Admiral must have to challenge the legality of 
insuring PeopleCare’s punitive damages.  Westchester’s Stowers 
action may involve a justiciable controversy, but Admiral’s pre-1995 public 
policy challenge does not.
        Moreover, 
it is difficult to understand what the majority means by its statement that this 
opinion “confuses Admiral’s standing with Admiral’s failure to raise its 
public policy scope of coverage issue sooner.  That is a question of 
estoppel, not standing.”[13]  This 
issue, which the majority has raised sua sponte, has no relevance to 
Admiral’s standing to challenge the insurability of punitive damages. Standing 
is a component of subject matter jurisdiction and cannot be waived.[14]  Because Admiral had no standing to 
challenge the legality of PeopleCare’s insurance contract on pre-1995 public 
policy grounds, the trial court had no subject matter jurisdiction to decide the 
issue whether Admiral was estopped from asserting it or not.[15]
        I 
would hold that gross negligence is a covered claim under the language of 
Admiral’s insurance contract, and that Westchester, as PeopleCare’s 
equitable subrogee, is entitled to pursue recovery on its Stowers action 
for any excess damages it paid on that claim as a result of Admiral’s 
negligence.  I would further hold that the trial court erred in rendering 
summary judgment against Westchester on public policy grounds because Admiral 
has no standing to challenge the insurability of punitive damages under the 
facts of this case.  Because the trial court had no subject matter 
jurisdiction to decide the public policy question, I would vacate and set aside 
the trial court’s judgment[16] and remand 
the case for trial on the remainder of Westchester’s Stowers action 
against Admiral.
  
 
                                                                  JOHN 
CAYCE
                                                                  CHIEF 
JUSTICE
 
HOLMAN, 
J. joins.
 
DELIVERED: 
December 2, 2004


NOTES
* Majority Opinion by Justice Livingston; Concurring & 
Dissenting Opinion by Chief Justice Cayce
 
MAJORITY OPINION NOTES
1.  
The terms exemplary damages and punitive damages are used interchangeably 
throughout this opinion; however, all references to either refer to damages 
recoverable under chapter 41 of the civil practice and remedies code.  See 
Tex. Civ. Prac. & Rem. Code Ann. 
§§ 41.001-.013 (Vernon 1997 & Supp. 2004-05).
2.  
Westchester alleged several claims against Admiral but tried only the Stowers 
claim.
3.  
Admiral’s policy limits were reduced by defense costs and a $10,000 
deductible.
4.  
Westchester does not specifically refer to the partial summary judgment, but 
rather the court’s previous ruling regarding the insurability of punitive 
damages.  We construe Westchester’s challenge to the court’s prior 
ruling as a challenge to the partial summary judgment.  See Tex. R. App. P. 38.9.
5.  
Again, we do not discuss the court’s ruling on the Cagles’ award of DTPA 
treble damages and attorneys’ fees because Westchester has not challenged 
their denial on appeal.
6.  
A review of other states’ decisions on this issue shows that
 
[t]here is considerable authority that liability insurance coverage of an award 
of punitive damages is generally void as contrary to public policy. . . . 
[However,] several jurisdictions recognize that there is no public policy 
concern which ordinarily precludes insuring against liability for punitive 
damages, so that policy provisions broad enough to include such coverage could 
be enforced.
 
Id. §101:29, at 101-100, 101-106 (citations omitted). In twenty-nine other 
states, insurance coverage for punitive damages does not violate public policy; 
however, eight of those states exclude coverage for punitive damages arising out 
of intentional acts.  See McCullough, Campbell & Lane, The 
Insurability of Punitive Damages, Jurisdictional Analysis, at 
http://www.mcandl.com/puni_ states.html (last visited November 22, 2004); see 
also Russ, supra, at 
101-99 to 101-109.  Fifteen states hold that insurance coverage for 
punitive damages is void as against public policy, but eight of those states 
allow coverage for punitive damages that are imposed as a result of vicarious 
liability.  See McCullough, Campbell & Lane, supra; see 
also Russ, supra.
7.  
Admiral’s policy period was from December 1, 1993 to December 1, 1994.
8.  
We did not receive any amicus briefs in connection with this case.
9.  
We note that the partial summary judgment is overly broad in that insurance 
coverage for punitive damages cannot be void as against public policy in all 
cases because the legislature has provided that an endorsement is available to 
certain entities in the context of professional medical liability insurance.  
See Tex. Ins. Code Ann. 
art. 5.15-1, § 8.
10.  
Also referred to elsewhere as an “exhausting” or “wasting” limits 
policy.
11.  
A post-trial letter from Michael Knippen, an attorney whom Westchester hired to 
investigate the claim after the trial judge made his initial ruling on damages, 
indicates that “[p]laintiff’s counsel indicated recently that the defendants 
were told at the mediation that the case could be settled for the primary policy 
regardless of the erosion of its limits.”  The letter also states,

Because of Admiral’s exhausting limits . . . Westchester may not argue Admiral 
could have settled this matter within their limits when the Plaintiff’s made 
their $1 million demand.  Assuming each policy [Admiral’s and 
Westchester’s] is given effect as written, the exhausting nature of 
Admiral’s limits inhibited it from entering into a settlement agreement with 
the Plaintiff.
 
A footnote at the end of the quoted language, however, indicates that this 
evaluation is “[s]ubject to plaintiff’s indications to defense counsel.”
12.  
The parties dispute whether Admiral or PeopleCare controlled the mediation 
offer.  Admiral contends that PeopleCare’s representative would not allow 
Robinson and Godbey to offer more than $40,000 while Westchester contends that 
the $40,000 offer was Admiral’s idea.  A handwritten note made by Elijah 
Guest, who monitored the claim for Westchester, was introduced into evidence at 
trial.  The note detailed a telephone conference between Guest and Jane 
Hill, the adjuster handling the claim for Admiral.  Guest’s note 
indicates that he “advised Hill that counsel’s recent damages/value report 
indicated . . . that insured would not allow an opening offer above $40K.  
Hill said Admiral chose the 40K figure.”  Because we must view the 
evidence in the light most favorable to Westchester, we assume that Admiral 
controlled the decision to make offers at the mediation.
13.  
Any damages Westchester may recover at trial will be reduced by the amount of 
Admiral’s settlement credit and Lola’s DTPA treble damages and attorneys’ 
fees.
 
CONCURRING & DISSENTING OPINION NOTES
1.  Brown v. Todd, 53 S.W.3d 297, 302 (Tex. 
2001).  Although Westchester has not raised this issue, standing is a 
component of subject matter jurisdiction and cannot be waived by the parties.  
Tex. Ass’n of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 445 (Tex. 
1993).
2.  Id. at 443; see Tex. Const. art. II, § 1; Tex. Const. art. I, § 13.
3.  Brown, 53 S.W.3d at 302; Firemen’s Ins. 
Co. v. Burch, 442 S.W.2d 331, 333 (Tex. 1968).
4.  See Allen v. Wright, 468 U.S. 737, 751, 104 
S. Ct. 3315, 3324 (1984).
5.  Valley Baptist Med. Ctr. v. Gonzalez, 33 
S.W.3d 821, 822 (Tex. 2000).
6.  Tex. Const. 
art. I, § 13 (emphasis supplied).
7.  Brown, 53 S.W.3d at 302.
8.  G.A. Stowers Furniture Co. v. Am. Indem. Co., 
15 S.W.2d 544 (Tex. Comm’n App. 1929, holding approved).
9.  Maj. Op. at 35 (citation omitted).
10.  Admiral has not argued that public policy would 
be violated by allowing Westchester, as a Stowers plaintiff, to recover 
excess on a gross negligence claim, only that it was against public policy to 
insure punitive damages on or before 1995.
11.  Mobil Oil Corp. v. Shores, 128 S.W.3d 718, 
722 (Tex. App.—Fort Worth 2004, no pet.) (op. on reh’g).
12.  Id.
13.  Maj. Op. at 37.
14.  Tex. Ass’n of Bus., 852 S.W.2d at 445.
15.  The majority’s holding that Westchester is 
barred from claiming Admiral is estopped from challenging the insurability of 
punitive damages is yet another advisory ruling by the majority because neither 
party raised the issue of estoppel.
16.  Mobil Oil Corp., 128 S.W.3d at 722 
(holding that if the trial court lacks subject matter jurisdiction, “we only 
have jurisdiction to set the trial court’s judgment aside”).